UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:15-CV-00076-TBR

REGINALD RADFORD                                    PLAINTIFF

v.

EBONITE INTERNATIONAL, INC.                         DEFENDANT

## Memorandum Opinion and Order

This matter is before the Court upon Defendant Ebonite International, Inc.'s motion for summary judgment. [DN 20.] Plaintiff Reginald Radford responded, [DN 31], and Ebonite replied, [DN 36]. Fully briefed, this matter is ripe for adjudication. For the following reasons, Ebonite's motion is GRANTED IN PART and DENIED IN PART.

## I. Facts and Procedural History

Ebonite International is a leading manufacturer of bowling balls and equipment. Its primary manufacturing facilities are located in Hopkinsville, Kentucky. For a time, Plaintiff Reginald Radford was employed by Ebonite in its Hopkinsville factory, eventually attaining the "lead man" position in the foam cores department. [DN 29 at 5.] Radford was also a union steward. [*Id.*] In that role, he would write grievances on behalf of himself and other employees "if the company didn't go by the union book." [*Id.*]

Radford's supervisor, with whom he was often at odds, was Charlie Worsham. Conflict between the two stretches back to 2011, when Worsham, a white male, denied Radford's request for overtime. *See* [DN 36-1 at 8.] Worsham filed a

harassment complaint, saying that Radford, an African-American, called him a "racist." [*Id.*] It is unclear how Ebonite addressed Worsham's complaint.

The events giving rise to this case began in early 2013 after Radford filed a series of grievances. On January 31, Radford complained that Worsham attempted to deny him a paid day of leave. [DN 20-2 at 86.] At Ebonite, employees who have perfect attendance for six months in a row are rewarded with a paid day off, known as a "goody day." [DN 29 at 13.] According to Radford, he was entitled to a goody day, but Worsham altered Radford's paperwork to make it look like he was not. [*Id.*] In his grievance, Radford wrote that he was "[t]ired of the [lying], discrimination, and harassment." [DN 20-2 at 86.] Worsham said he made a mistake, and Radford received his goody day. [*Id.*]

Also on January 31, Radford requested that he be allowed to continue working an hour of overtime each day. [*Id.* at 87.] As a lead man, it was Radford's job to come in an hour early to prepare certain factory systems. [DN 29 at 6.] Radford testified the company increased his production quota, but took away his extra hour. [*Id.* at 14.] He said Ebonite also stopped allowing other African-American lead men to work overtime, although overtime was allowed for white lead men. [*Id.*] In response to Radford's grievance, Worsham wrote that there was "no need for overtime" because a "[t]ime study shows employee can complete all requirements in an 8 hr. period." [DN 20-2 at 87.]

About two weeks later, Radford filed another grievance against Worsham. He complained that on two successive days, Worsham cursed at another employee

2

because of problems on the manufacturing line. [*Id.* at 88.] Radford said the employee was "tired of being stress[ed] out. [A]nd this is the 5th or 6th time this has happened." [*Id.*] In response to each of Radford's three grievances, Regina Arnold, Ebonite's Personnel/HR Manager, wrote that Worsham was "disciplined" and new procedures were put in place to prevent future occurrences. [*Id.* at 86-88.]

Radford made one final complaint about Worsham's behavior in early 2013. He alleged Worsham routinely allowed white employees to arrive late to work without consequence, but would not afford African-American employees the same leniency when they were tardy.[1] [*Id.* at 8-9.] Arnold investigated Radford's allegations and found that a white employee, David Hawkins, had indeed been allowed to change his schedule when he was late on nine occasions. [DN 20-4 at 2-3.] As a result of her findings and Radford's other grievances, "Ebonite suspended Worsham and required him to attend management training." [*Id.* at 3.]

Immediately after returning from his suspension, Radford says, Worsham began retaliating against Radford. Specifically, Radford alleges Worsham "increased Radford's work load, removed a partition that shielded Radford from flying debris . . . and asked a co-worker to watch for mistakes by Radford." [DN 31 at 10.] According to Radford, the first day Worsham was back on the factory floor, Radford observed Worsham tell a union steward to "watch [him]," ostensibly to make sure he was working. [DN 20-2 at 9.] Radford did not actually overhear the conversation, but instead testified he was able to read Worsham's lips and

---

[1] The record does not appear to contain any formal grievance written by Radford regarding Worsham's alleged discriminatory practices. However, Ebonite and its witnesses admit that Radford made this complaint, and that Worsham was suspended as a result. [DN 20-1 at 4.]

understand what he was saying to the steward.   [*Id.*]   He also says Worsham told another employee, Will Poindexter, not to assist Radford whenever Radford fell behind on his work.   [DN 29 at 19-20.]

Shortly thereafter, Radford met with Carl Rogers, Ebonite's CFO, and Arnold regarding Worsham's conduct.   [DN 20-2 at 10.]   During their meeting, Radford mentioned that his desk was partially surrounded by a welding shield.   [*Id.*] Radford's desk was located "right next to a ball drilling machine [that] kicks off ball debris and dust."   [*Id.* at 14.]   About two years earlier, Radford said an Ebonite maintenance employee hung an obsolete welding shield around his desk to protect him from the debris.   [*Id.*]   The day after his meeting with Arnold and Rogers, the shield was gone.   [*Id.* at 10.]

The parties dispute the reason the welding shield was removed.   Ebonite points to a memo, dated March 6, 2013, in which the maintenance foreman explains that his department "need[s] [the welding shields] if we are going to weld for an extended amount of time.   I am not sure who said you could have these but they were mistaken."   [*Id.* at 89.]   For his part, Radford believes Ebonite manufactured a reason to have the shield removed, given that it had been hanging at his desk for two years without incident.   [*Id.* at 10.]   Radford filed a grievance on March 11, alleging the shield was removed in retaliation for his complaints regarding Worsham.   [*Id.* at 90.]   The welding shield was replaced by a clear curtain approximately two months later.   [*Id.* at 11.]   Radford filed a charge of

discrimination with the EEOC relating to these events on April 29, 2013.   [DN 33, Radford Ex. 0019.]

Several months later, Ebonite sought to cut production volume, and invited employees to participate in a voluntary layoff.   Radford took up Ebonite on its offer for the week beginning September 22, 2013.   [DN 29 at 7; DN 20-2 at 81.]   During past layoffs, Radford testified, the company made mass unemployment claims for all affected employees.   [DN 29 at 8.]   This time, however, Ebonite did not.   [*Id.*] When Radford learned the company had not filed a claim for him, he filed one on his own behalf.   [*Id.* at 9.]   The unemployment office denied that claim as untimely, and Radford appealed.   [*Id.*]   Apparently, while that appeal was pending, Radford instructed his wife to file another claim on his behalf for the same voluntary layoff period.   [*Id.* at 8-9.]   Unfortunately, the office's automated phone system recorded that Radford was attempting to claim benefits for a two-week period beginning September 29 – weeks during which he worked.   [DN 20-2 at 81-82.]

The local unemployment office soon realized the error, and sent a notice to Ebonite stating Radford "knowingly made false statements to establish the right to or the amount of benefits.   This appears to be a violation of KRS 341.990(5) and may be referred for criminal prosecution."   [DN 33, Ebonite Ex. 0067.]   On December 12, 2013, Ebonite terminated Radford's employment.   Radford's termination letter states that "[a]s the result of the fraudulent obtaining of Unemployment Insurance Benefits during weeks in which you were working here at Ebonite, a decision has been made to terminate your employment today."   [DN 20-2

at 84.]   The letter specifically cites Ebonite Work Rule #10, which prohibits the "[v]iolation of any criminal law," including "stealing [and] making fraudulent records."   [*Id.*]

Radford appealed the unemployment office's determination of fraud.   Soon after his termination, Radford had a hearing before the Division of Unemployment Insurance Appeals Branch.   [DN 33, Radford Ex. 0027.]   The unemployment referee held Radford "did not knowingly make a false statement to obtain benefits," apparently accepting Radford's explanation that his wife had inadvertently applied for benefits beginning on the wrong date.   [*Id.*]   He ordered Radford to repay $830.00, the amount of extra benefits Radford received.   [*Id.* at Radford Ex. 0028.] The referee's decision was upheld by the Kentucky Unemployment Insurance Commission.   [*Id.* at Radford Ex. 0029.]

Next, Radford proceeded to arbitration under the terms of the labor agreement between Ebonite and his union.   Before the arbitrator, Ebonite argued Radford was justly terminated for filing a false claim for unemployment benefits. [DN 20-4 at 8.]   The union asked for reinstatement and back pay, claiming Ebonite had no reason not to take Radford back after the state reversed its initial fraud determination.   [*Id.* at 9.]   The arbitrator sided with Ebonite, ruling that even though the referee determined there was no just cause for taking criminal action against Radford, the company was still justified in terminating Radford for violating its rules against theft.   [*Id.* at 17.]   Radford received his right-to-sue

letter from the EEOC on December 31, 2014, and filed this suit on April 1, 2015. [DN 33, Radford Ex. 0031; DN 1.]

Radford claims the actions of Worsham and Ebonite amount to unlawful race discrimination and retaliation. Specifically, he says other Ebonite employees, some of whom were white, also received unemployment overpayments but were not terminated. Radford also alleges that both his termination and Worsham's actions upon returning from suspension were retaliation for Radford's grievances and EEOC complaint. Ebonite now moves for summary judgment. [DN 20.]

## II. Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477

U.S. at 251-52).  As the party moving for summary judgment, Ebonite must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of each of Radford's claims.  Fed. R. Civ. P. 56(c); see *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming Ebonite satisfies its burden of production, Radford "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### III. Discussion

Two threshold issues bear mention.  First, Ebonite argues Radford's Title VII claims are untimely.  Title VII plaintiffs must file suit within ninety days of receiving a right-to-sue letter from the EEOC.  *See* 42 U.S.C. § 20003-5(f)(1); *Fuller v. Mich. Dept. of Transp.*, 580 F. App'x 416, 424 (6th Cir. 2014).  Here, the EEOC issued Radford's right-to-sue letter on December 31, 2014.  [DN 33, Radford Ex. 0031.]  Radford filed this action on April 1, 2015, ninety-one days later.  *See* [DN 1.]  Courts in this circuit "presume[] that notice is given, and hence the ninety-day limitations term begins running, on the fifth day following the mailing of a right-to-sue notification to the claimant."  *Rembisz v. Lew*, 830 F.3d 681, 682 (6th Cir. 2016) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th Cir. 2000)) (cleaned up).  Ebonite seeks to rebut this presumption, pointing to Radford's deposition testimony:

> Q: Is this your notice of right to sue?
> A: Yes.

> Q: When did you get that?
> A: I don't know the date.  I don't know the date that I received it.  I got it in, I know it was in '14, 2014, but I don't know the exact date or month that I received it.
> Q: But you think you got it in 2014?
> A: Yes.  I think, yeah, December.  Because I know I had 90 days to get it filed in federal court.  So I think I got it filed in March of '15.  So yeah, it was December.

[DN 29 at 17.]  The Court is not convinced this testimony, standing alone, is enough to rebut the presumption Radford received the EEOC's notice on January 5, 2015.  Radford did indeed testify he "think[s]" he received the notice in December 2014.  But he also testified, incorrectly, that he "think[s]" he filed suit in March 2015.  This demonstrates Radford has at least some confusion regarding the precise timeline of his case, and calls into question the reliability of his testimony regarding the date he received the EEOC's notice.   Radford's Title VII claims are timely.

Second, in addition to his claims under Title VII, Radford also brings claims under the Kentucky Civil Rights Act (KCRA), KRS 344.010 *et seq.*, and 42 U.S.C. § 1981.   The KCRA "is similar to Title VII . . . and should be interpreted consistently with federal law."   *Ammerman v. Bd. of Educ. of Nicholas Cty.*, 30 S.W.3d 793, 797-98 (Ky. 2000).   Likewise, § 1981 "prohibits intentional race discrimination in the making and enforcing of contracts," *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006), and courts analyze § 1981 claims under the "same analytical framework" as Title VII claims.   *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000) ("The elements of *prima facie* case as well as the allocations of the burden of

proof are the same for employment claims stemming from Title VII and § 1981.")).
The Court will now turn to the merits of Radford's discrimination and retaliation
claims.

## A. Discrimination

At the outset, there is some confusion regarding the nature of Radford's
discrimination claim.   Typically, absent direct evidence of discrimination, a claim
of disparate treatment is subject to the burden-shifting approach set forth in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   The burden initially lies
with the plaintiff to establish a *prima facie* case of disparate treatment.   The
burden then shifts to the defendant to articulate a legitimate, nondiscriminatory
reason for its action.   Assuming it does so, the burden shifts back to the plaintiff to
demonstrate the defendant's proffered reason is merely pretext for unlawful
discrimination.   *Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999).   Radford
refers to the *McDonnell Douglas* framework in his briefing.   [DN 31 at 11.]

However, Radford also characterizes his claim as one involving mixed-motive
discrimination.   [*Id.*]   In a mixed-motive case, the plaintiff alleges "an adverse
employment decision was the product of a mixture of legitimate and illegitimate
motives."   *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012)
(citations omitted).   The *McDonnell Douglas* burden-shifting framework does not
apply to mixed-motive claims.   *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th
Cir. 2010) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir.
2008)).   "Instead, 'a Title VII plaintiff asserting a mixed-motive claim need only

produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action.'" *Id.* (quoting *White*, 533 F.3d at 400). In contrast to the panoply of remedies available in a single-motive Title VII case, "a plaintiff asserting a mixed-motive claim is entitled only to declaratory relief, limited injunctive relief, and attorney fees and costs where the employer demonstrates that it would have taken the same employment action in the absence of an impermissible motivating factor." *Id.*

Here, it appears Radford attempts to bring his Title VII discrimination claim under both a single-motive and mixed-motive theory. The Court will address each in turn, but it is first necessary to address the type of evidence Radford seeks to use to prove his case. Both single-motive and mixed-motive claims can be proven using either direct or circumstantial evidence of discrimination. *See Tennial*, 840 F.3d at 302; *Ondricko*, 689 F.3d at 649. "Direct evidence consists of facts that, if believed, require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tennial*, 840 F.3d at 302 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)) (cleaned up). In contrast, "[c]ircumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Ondricko*, 689 F.3d at 649 (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).

Radford argues he has brought forth direct evidence of discrimination. Particularly, he relies upon the fact that after he reported Worsham's differential treatment of African-American employees when it came to attendance, Ebonite suspended Worsham and made him attend management training. Granted, Worsham's suspension might suggest that Worsham acted in a discriminatory manner. But it is not direct evidence of discrimination, and it does not tend to prove Radford was terminated because of his race. To decide Worsham's suspension was evidence of discrimination, a factfinder would necessarily have to make an inferential leap: since Worsham was suspended, it must mean he discriminated. Because such a leap is required, Worsham's suspension is not direct evidence.

Even if it were, the crux of Radford's discrimination claim is not that Worsham discriminated against African-American employees in recording absences. Rather, Radford's claim rests on his belief that race played some part in his termination. Radford does not allege Worsham was involved in the decision-making process that led to his firing, nor does any evidence brought to the Court's attention support that notion. In fact, Radford admits Worsham was not present during the meeting in which he was let go. [DN 31 at 8.] Worsham's suspension also occurred more than nine months before Radford's firing. As explained below, Radford's grievances against Worsham and Worsham's subsequent actions are relevant to Radford's retaliation claim. But they cannot be used as direct evidence to support the discrimination claim arising from his termination. Under either a

single-motive or mixed-motive theory, then, Radford must proceed using circumstantial evidence.

(1) *Single-Motive*

To establish a *prima facie* case of single-motive discrimination based upon circumstantial evidence, Radford must show he was "(1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly situated nonminority employees." *Tennial*, 840 F.3d at 303 (citation omitted). The parties agree that Radford, an African-American, is a member of a protected class, that he was terminated – the prototypical adverse action – and that he was otherwise qualified for his position. However, they dispute whether Ebonite treated any similarly-situated employees more favorably than Radford.

On this point, Radford contends several other employees, some white, received unemployment overpayments but were not terminated. During his deposition, Radford named twelve fellow employees – eight African-American and four white – whom he believes received overpayments. [DN 29 at 7-8.] Ebonite also admits some employees were paid extra benefits. In her affidavit, Regina Arnold states that "[i]n 2014, Ebonite learned of other Ebonite employees, both black and white, who neglected to report holiday pay . . . during weeks in which they worked." [DN 20-4 at 4.] However, only Radford was terminated. Ebonite argues these employees are not proper comparators, because "[n]one of the other

employees . . . filed claims for benefits that were denied and then filed again for benefits for weeks they worked at Ebonite."   [DN 36 at 5.]

The Sixth Circuit directs "that to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).   However, "[t]he nonprotected employee need not be identical in every way in order to be a proper comparator.   Instead, the plaintiff must show that the comparator is similarly situated in all relevant aspects and has engaged in acts of comparable seriousness." *Tennial*, 840 F.3d at 304 (citing *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).   It is true that Radford re-applied for benefits after first being denied, something the other employees who received overpayments apparently did not do.   However, the Court fails to see the significance of this distinction.   The conduct at issue here is the same: employees applying for unemployment benefits to which they were not entitled.

Radford has established that he was similarly-situated to other Ebonite employees who received extra unemployment benefits, and that he was treated differently than the four white employees who were not terminated.   The burden

now shifts to Ebonite to articulate a legitimate, nondiscriminatory reason for its action. *Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999). Ebonite has done so, explaining it fired Radford because it received notice from a state agency stating he committed fraud. This constituted a violation of Ebonite's work rule against theft and the making of false records. *See Fuller v. Mich. Dept. of Transp.*, 580 F. App'x 416, 427-28 (6th Cir. 2014) (suggesting employers are entitled to terminate employees who commit unemployment benefits fraud).

At the final stage of the *McDonnell Douglas* inquiry, the burden shifts back to Radford to demonstrate Ebonite's proffered reason for terminating him is merely pretext for unlawful discrimination. *Hollins*, 188 F.3d at 658. Radford may demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Elgabi v. Toledo Area Reg'l Transit Auth.*, 228 F. App'x 537, 540 (6th Cir. 2007) (quoting *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (en banc) (6th Cir. 2003)). Here, Radford argues his termination was pretextual because his unemployment appeal was successful and because other employees who received overpayments were not fired. Neither argument is sufficient to show pretext.

First, the fact that Radford won his unemployment appeal is not determinative. At this stage, the appropriate question is not whether Radford actually committed fraud. Rather, the question is whether Ebonite "reasonably and honestly relie[d] on" the letter from the unemployment office in deciding to let

15

Radford go, "even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007)).   Stated otherwise, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 728 (6th Cir. 2008) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).   Here, Ebonite received an official communication from a government agency stating one of its employees had broken the law.   Given no reason to question the veracity of that letter, Ebonite chose to fire Radford based upon the conduct alleged by the state.

Second, it is true that other employees received overpayments, but were not punished.   But that is only part of the story.   In her affidavit, Arnold explains that while other employees received extra benefits in late 2013, it only received a notice of fraud as to Radford.   [DN 20-4 at 3.]   Radford brings forth no evidence rebutting this statement.   If indeed Ebonite treated Radford differently, it had a good reason for doing so – Ebonite did not know the other employees were also overpaid.

Finally, the fact that both African-American and white employees were kept on after receiving overpayments significantly undercuts Radford's argument that he was terminated because of his race.   Radford admits that eight of the twelve employees he believes received extra benefits were African-American.   He fails to explain why, if his race was indeed the reason for his termination, one or more of

16

the other eight African-American employees were not also subjected to an adverse employment action.

In sum, Radford cannot establish that race formed the sole basis of his termination by Ebonite.  Although he has satisfied his burden at the *prima facie* stage, Ebonite has shown that it possessed a legitimate, nondiscriminatory reason for its decision – here, its belief that Radford committed unemployment benefits fraud.  Radford has not demonstrated Ebonite held that belief in bad faith, nor has he brought forth any other evidence suggesting Ebonite's proffered reason for his discharge is mere pretext for discrimination.  This proves fatal to this aspect of Radford's Title VII discrimination claim, as well as his discrimination claims under the Kentucky Civil Rights Act and 42 U.S.C. § 1981.[2]

(2) *Mixed-Motive*

Even if Radford cannot prevail under a single-motive theory, he might still prevail under a mixed-motive discrimination framework.  Here, Radford may defeat Ebonite's motion by "produc[ing] evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action."  *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (quoting *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 400 (6th Cir. 2008)).  This burden "is not onerous and should preclude sending the case to

---

[2] The mixed-motive analysis does not apply to claims under the Kentucky Civil Rights Act or 42 U.S.C. § 1981.   *See Walker v. Commonwealth*, 503 S.W.3d 165, 174-75 (Ky. App. 2016); *Williams v. Zurz*, 503 F. App'x 367, 375 (6th Cir. 2012).

the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* (citations omitted).

Even with the benefit of a more lenient standard, Radford still fails to establish a connection between his termination and his race. The Court is mindful that Radford has established a *prima facie* case under *McDonnell Douglas*, something that "can be considered in favor of his mixed-motive claim[]." *Graham v. Best Buy Stores, L.P.*, 298 F. App'x 487, 495 (6th Cir. 2008) (citation omitted). However, this fact alone is not dispositive. *See id.* Importantly, Radford has neither alleged nor shown Rogers or Arnold, the Ebonite officials responsible for his firing, "harbored any racial animus toward [him]." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 768 (6th Cir. 2008). Nor has he alleged or shown Worsham, the supervisor against whom he levies the bulk of his accusations, was involved in Ebonite's decision to terminate his employment. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir. 2014) ("[Plaintiff] does identify instances suggesting that some other employees . . . felt and expressed [racial] animus, but he does not identify facts to indicate that these employees influenced" the supervisor who declined to promote him.).

Instead, much of Radford's mixed-motive discrimination claim overlaps with his retaliation claim. Radford essentially argues that because of his role as an African-American union steward advocating on behalf of other African-American employees, Ebonite not only retaliated against him, but also discriminated against him. However, as explained below, there is no evidence suggesting that Radford's

termination was tied to his union activity. And while Worsham may have retaliated against Radford because of his grievances, Radford has not demonstrated Worsham influenced Rogers or Arnold in their decision to terminate his employment. Absent any other evidence that race was a motivating factor in his termination, Radford's mixed-motive claim is too speculative to survive summary judgment.[3]

## B. Retaliation

In addition to his discrimination claims, Radford also brings a claim of retaliation.[4] Title VII "makes it unlawful for an employer to discriminate against an employee because the employee opposed an unlawful employment practice, or made a charge, or participated in an investigation, proceeding, or hearing related to Title VII." *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541, 543 (6th Cir. 1993). A plaintiff may prove his Title VII retaliation claim through direct or circumstantial evidence. *Henry v. Ohio Dept. of Mental Retardation & Developmental Disabilities,* 162 F. Supp. 2d 794, 800 (S.D. Ohio 2000). Again, this case presents no direct evidence of retaliation, so the Court must apply the *McDonnell* balancing test. *Id.*; *McDonnell,* 411 U.S. at 802. "[T]o establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2)

---

[3] Radford also argues Worsham's decision to deny Radford and other African-American employees an hour of overtime each day amounted to discrimination. *See* [DN 31 at 12.] However, Radford makes this argument only in passing, and "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (citation omitted). Additionally, Radford testified that he continued to work overtime after his extra hour each morning was cut. [DN 29 at 21.]

[4] A mixed-motive analysis does not apply to such claims. *Johnson v. Fifth Third Bank*, 151 F. Supp. 3d 763, 773 (E.D. Mich. 2015) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013)).

the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).   The causal connection must be proven by sufficient evidence to demonstrate an inference that, had the plaintiff not engaged in his protected rights, the defendant would not have taken the adverse action.   *Id.*   If the plaintiff successfully establishes a *prima facie* case of retaliation, "a presumption of unlawful retaliation arises and the burden of production shifts to the defendant to rebut the presumption by articulat[ing] some legitimate, nondiscriminatory reason for its action." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citation and internal quotation marks omitted).   Then, if the defendant successfully produces a legitimate, nondiscriminatory reason, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination."   *Fuhr*, 710 F.3d at 675 (citing *Abbott*, 348 F.3d at 542).

Although Radford articulates a single retaliation claim, his briefing makes apparent that he actually maintains two theories of retaliation.   Radford first contends Worsham retaliated against him for filing workplace grievances by "increas[ing] Radford's work load, remov[ing] a partition that shielded Radford from flying debris[,] . . . and asked a co-worker to watch for mistakes by Radford."   [DN

31 at 10.]   He also says Ebonite terminated him in retaliation for filing a complaint with the EEOC.   The Court will address the two theories separately.

(1) *Grievances*

Not all work-related grievances constitute protected activity under Title VII. Rather, the plaintiff must have "opposed unlawful employment practices, or made a charge, or participated in an investigation, proceeding or hearing *related to Title VII*" in order for the grievance to fall within the statute's purview.  *Batuyong v. Gates*, 337 F. App'x 451, 456 (6th Cir. 2009) (emphasis in original) (citing *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 541 (6th Cir 1993)).   Here, Radford filed several grievances against Worsham, at least two of which related to race discrimination. In his grievance complaining that Worsham wrongly denied him a paid day off, Radford stated he was "[t]ired of the [lying], discrimination, and harassment."   [DN 20-2 at 86.]   More to the point, though, Radford specifically alleged Worsham held African-American employees to a more stringent standard when it came to arriving at work on time.   [DN 20-2 at 8-9; DN 20-1 at 4; DN 20-4 at 2-3.]   The Court is satisfied these grievances amounted to protected activity under Title VII.   *See Adamov v. U.S. Bank Nat'l Assoc.*, ___ F. App'x ___, 2017 WL 902141, at *4 (6th Cir. Mar. 7, 2017).

It is undisputed that Ebonite knew about Radford's grievances.   The next question, then, is whether Worsham's actions following his return from suspension were adverse under Title VII.   In this context, an adverse employment action is one that results in "a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (citation omitted). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

Several of Radford's complaints come closer to "de minimis employment actions" insufficient to give rise to Title VII liability. *Id.* For instance, Radford alleges Worsham told Will Poindexter not to assist Radford with his job duties, contrary to Poindexter's earlier practice. [DN 29 at 19-20.] He also says he saw Worsham tell another union steward to keep an eye on Radford. [DN 20-2 at 9.] But, as noted above, "a mere inconvenience or an alteration of job responsibilities" does not, by itself, constitute an adverse employment action. *Mitchell*, 389 F.3d at 182. Even taking Radford's testimony as true, these actions were designed to do nothing more than make sure Radford did his job.

Nevertheless, the Court believes Radford's allegation that Worsham had the welding curtain surrounding Radford's desk removed, if proven true, could constitute an adverse action. Radford testified the curtain shielded him from debris and dust emitted by a nearby ball drilling machine. [DN 20-2 at 14.] The curtain was gone for approximately two months until it was replaced by a clear screen. [*Id.* at 11.] During the interim period, Radford was presumably exposed to the debris from the machine. At least one Sixth Circuit case, albeit

22

unpublished, suggests that an employment action may be materially adverse if it makes the circumstances of the employee's job more dangerous.  *See Virostek v. Liberty Twp. Police Dept./Tr.*, 14 F. App'x 493, 511 (6th Cir. 2001).  Here, a reasonable jury could conclude Worsham's removal of the curtain was designed to have a chilling effect upon Radford's protected activity.

The final element of Radford's *prima facie* retaliation case is causation. Radford must bring forth evidence sufficient to demonstrate an inference of *but for* causation; that is, had he not filed the protected grievances, Worsham would not have taken the welding curtain away.   *Abbot*, 348 F.3d at 542; *Nguyen*, 229 F.3d at 563.  As to causation, Radford's case is based primarily, if not exclusively, on temporal proximity.  "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  Here, the welding curtain was removed only two days after Worsham returned from his suspension, a period the Sixth Circuit has held to be short enough to give rise to an inference of causation.  *See Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007); *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).  Radford has met his burden at the *prima face* stage.

As with Radford's discrimination claim, the burden now shifts to Ebonite "to rebut the presumption [of retaliation] by articulat[ing] some legitimate,

nondiscriminatory reason for its action." *Fuhr*, 710 F.3d at 674.   Ebonite has done just that, explaining the curtain should never have been around Radford's desk in the first place.   They point to a memo to Radford from the maintenance foreman stating his department needed to use the curtain for welding.   [DN 20-2 at 89.] Radford does not contest the authenticity of this memo, nor does he contradict the foreman's statement that the curtain belonged to the maintenance department.

Ebonite having produced a legitimate, nondiscriminatory reason, the burden shifts back to Radford "to demonstrate . . . that the proffered reason was a mere pretext" for retaliation.   *Fuhr*, 710 F.3d at 675 (citation omitted).   Although this presents a close call, the Court believes Radford has presented sufficient evidence of pretext to allow his retaliation claim to go to a jury.   Particularly, Radford testified that the curtain had been hanging around his desk for two years without incident. [DN 20-2 at 10.]   He also stated the maintenance department is only five to ten feet away from his own department, suggesting that if indeed the curtain belonged to maintenance, the foreman would likely have noticed it beforehand.   [DN 29 at 12.] Ebonite does not dispute either of these facts.   Taken together with the temporal proximity between Radford's grievances and Worsham's suspension, a reasonable jury could also conclude Ebonite's explanation for removing the curtain was pretextual.

(2) *EEOC Complaint*

The same cannot be said, however, for Radford's termination.   While his EEOC complaint is protected activity, *see Mickey*, 516 F.3d at 523, Radford brings

forth insufficient evidence of causation.[5]   Temporal proximity aside, Radford points to no evidence of record demonstrating Ebonite fired him because of his EEOC complaint.   And here, the time that elapsed between his complaint and his termination – seven-and-a-half months – is insufficient, standing alone, to support an inference of retaliation.   *See Nguyen*, 229 F.3d at 566-67 (citing *Parnell v. West*, 114 F.3d 1188, 1997 WL 271751, at *2 (6th Cir. May 21, 1997) (unpublished table decision)).   As to this theory of retaliation, Radford has not met his burden at the *prima facie* stage, and Ebonite is entitled to summary judgment.

## IV. Conclusion

As they pertain to his termination from Ebonite, Radford presents no genuine issue of material fact regarding either his discrimination or retaliation claim. However, a triable issue does exist regarding whether Worsham retaliated against Radford for filing the grievances that led to Worsham's suspension.   That claim, and that claim only, must be decided by a jury.

For the foregoing reasons, IT IS HEREBY ORDERED:

Defendant Ebonite International, Inc.'s motion for summary judgment [DN 20] is GRANTED IN PART AND DENIED IN PART.

CC: Counsel of Record

---

[5] The Court will assume Rogers, Ebonite's CEO and the person ultimately responsible for terminating Radford's employment, knew of Radford's EEOC complaint.

25